[Civ. No. 20071.   Second Dist., Div. Two.   Dec. 23, 1954.]

Estate of HARRY SHERMAN, Deceased.   JACOB H.
KARP, as Executor, etc., et al., Respondents.   v.
THEODORA LOIS SHERMAN et al., Appellants.

Morris Lavine for Appellants.

John J. Irwin, O'Melveny & Myers, Pierce Works, H. P. Babson and John C. Goff for Respondents.

MOORE, P. J.—Appeal from order authorizing sale of corporate stock and directing a compromise of the estate's claim in the sum of $36,000 against California Studios, Inc., for $34,000.

At the time of his decease, September 30, 1952, Harry Sherman owned 1,550 of the outstanding 1,750 shares of the California Studios, Inc. The remaining 200 shares were owned by Attorney Babson, counsel for the executor. The corporation was indebted as follows:

| | |
|---|---|
| Labor claims | $ 28,000 |
| Unpaid rent | 9,000 |
| Delinquent taxes | 5,300 |
| Note and chattel mortgage | 43,000 |
| Account due decedent | 36,000* |
| Total | $132,000 |

The shade of decedent had but scarcely departed from the scene when the corporation, fearing dispossession for unpaid rent, determined that to conserve its assets and to

*One Mick asserted ownership of one-half interest in the $36,000, but such claim is not material to the instant controversy.

avoid an ouster, a petition for its reorganization under chapter XI of the Bankruptcy Act should be filed. Such act was accordingly done on October 27, 1952. Proceedings under such petition were pending when the executor filed his petition for a sale of his 1,550 shares of the insolvent corporation.

That petition sets forth the facts above recited and declared that there was no cash to pay current operating expenses; that if any assets of the corporation were to be saved, action by the federal court would have to be invoked under the provisions of chapter XI of the Bankruptcy Act. The executor then proceeds to relate that he has secured the agreement of Gross-Krasne, Inc., to purchase the shares held by the estate for $5,316.50 and to pay $34,000 in full settlement of the estate's claim against the corporation, by paying cash in the sum of $4,000 and the balance at the rate of $1,000 monthly on condition that the executor acquire for Gross-Krasne, Inc., the remaining 200 shares of the studios' stock ''at the same relative price,'' and had the agreement of Attorney Babson, the owner of such 200 shares, to make sale of same on the basis above designated; that Gross-Krasne has agreed to assume and pay all outstanding obligations of the Studios and to secure payment of such debts by procuring extensions for the payment of such obligations and Gross-Krasne has endorsed ''the notes of the corporation, representing such extended indebtedness covering all obligations of said corporation.''

The petition proceeds to declare that it is for ''the best interest of said estate that its stock in California Studios, Inc., referred to herein, be sold for the price set out herein and that the claim of decedent against California Studios, Inc., be settled for $34,000 under the terms and conditions above set forth. Your petitioner believes that if said sale is not made as outlined, no better offer can be secured and time does not avail for extended negotiations . . . no better proposal can be secured. . . . That for the purpose of securing . . . an adequate offer of payment of the amount of indebtedness . . . it is essential that all obligations of the corporation should be assumed and paid by the proposed purchaser. . . . Such proposed assumption of indebtedness is a material part of the consideration herein; that . . . extension from the landlord has been secured only in view of said proceeding under Chapter XI.''

Notice that the executor's petition had been filed and that a hearing thereon would be held on December 3, 1952, was

duly posted. Thereupon, proof of posting was filed and at the same time notice was served upon Arlynne Sherman, pursuant to her request for special notice.

Pending the hearing on such petition, the referee in bankruptcy had a hearing upon the plan of reorganization. Counsel for Arlynne was present; Gross-Krasne, Inc., was represented by its attorney. It was there shown that if the Studios, Inc., had not obtained an order to allow Studios, Inc., to remain in operation, the landlord would have been entitled to dispossess the Studios. At that time the bank accepted Gross-Krasne as the new obligor and mortgagor of the $43,000 and the landlord approved of an extension of the lease. When the hearing on the executor's petition was called on December 3, it appeared that if the court should not approve of the transaction, as proposed by Gross-Krasne, loss would be suffered through the bankruptcy court; that the bankruptcy court had confirmed an arrangement whereby the proposed purchaser has guaranteed the indebtedness of the creditors. After admonishing the lawyers to work out a settlement, the matter was continued to December 4. After the exchange of a few words, the matter was continued to December 5 at 9:15 a. m. when a discussion of the sale and compromise continued.

Prior to that date, no pleading had been filed by any party participating. No denial of any allegation of the petition was offered. All parties apparently considered all the statements of the petition true. Not a single proposal was uttered in traversal of the facts alleged in the petition. Arlynne had been present at all sessions of court. Neither she nor Theodora opposed the sale or the compromise on the theory that either was not for the welfare of the estate. They emphasized that they were seeking further continuance in order to find prospective buyers or for the purpose of making a bid with better understanding of the situation. There was no intimation that they lacked knowledge of the preceding events. All appellants knew from November 20th that the Studios, Inc., was in a precarious situation. Despite such knowledge, Theodora's attorney requested "a few days" to get "some other people interested . . . we think it is possible some one may pay considerably more for the stock." Arlynne's counsel objected to the "proposed sale and compromise on the ground that we wish to bid." But counsel for Gross-Krasne laid the facts fully before the court, substantially as follows: We found the landlord had filed a notice cancelling the lease for nonpayment of rent. That would have expired the day after

Studios, Inc., caused the petition under chapter XI to be filed. The landlord had a chattel mortgage on all the assets of the Studios, Inc. Also, the bank had a chattel mortgage for $43,000 senior to that of the landlord. If counsel for Studios, Inc., had not obtained an order to allow the studio to continue in operation, the landlord would have been entitled to declare and enforce his forfeiture. Our offer for the stock was fair. It was appraised at $5,400. We agreed to pay $6,000 and assume the indebtedness of the Studios, Inc., to the Sherman estate. We face a critical situation. There is a loss of $6,000 above the rent. If this matter should be delayed further, the referee in bankruptcy may insist that the matter be adjudicated, or that a receiver be appointed. In such event, the bank and the landlord will take over the assets.

The trial judge felt extreme anxiety about "killing the deal." It would get the estate out whole. The value of the stock cannot be much more than that indicated by the appraisal for the reason that the lease has only two and a half years. Unless this sale is made and the compromise be effected, it appears that the estate will suffer a total loss. The minute they put a receiver in bankruptcy, the estate would not have a penny in it. You are "right along" with the bank and its chattel mortgage. The petition must be approved but the stock must be put up for auction to bidders with money. The terms of sale are as follows: The sale price of the 1550 shares is $6,000 although the price quoted in the petition is $5,316.50, and the settlement for the estate's claim against Studios, Inc., is $34,000. If a different buyer bids for the stock, he will have to buy the estate's claim for $34,000. That is the only way. Then the estate will be out of it. The sale will be confirmed on the proposition that the purchaser has paid $34,000 to the estate. The estate would be satisfied with $39,316.50 then you lawyers can worry about it elsewhere. The bid will be for the 1550 shares and must be 10 per cent more than the $5,000 and pay the estate $34,000 in settlement of the Studios' debt to the estate. Miss Sherman stated that she could get the $39,000 plus ten per cent on the $5,000. She thereupon announced she had the money in her bag. The matter was then adjourned to be concluded at 3 o'clock. The court announced that (1) there will be no delay, no arguments; (2) simply, money will talk; (3) five thousand three hundred sixteen dollars and fifty cents plus 10 per cent is $5,848.15 plus $34,000, a total of $39,848.15;

(4) the $34,000 can be handled by a note with securities, either listed securities or government securities, government bonds at 10 per cent excess, and listed securities on the New York Exchange at 15. The bid for the stock must be by a cashier's check.

Recess having been taken until 3 p. m., the court reconvened at that hour. At 3:09 p. m. the court stated that the postponement had been taken "for the sole purpose of seeing if a bid would be forthcoming on this stock which is being sold for $5,361.50, and would require an additional ten per cent," and security for the $34,000 due the estate. Is a bid forthcoming?

Arlynne's attorney offered to file written objections on the ground that Arlynne is being treated inequitably by being required to meet the terms of 110 per cent United States bond collateral.

The court declined to permit objections to be filed and offered the stock "under the conditions and as the matter of the compromise agreement. Offered once, twice, sold, and the compromise agreement is approved."

Arlynne's counsel thereupon stated: "I would like to make a record of the point that the time element of one, two, three passed before I could open my mouth."

"THE COURT: . . . I didn't intend to give any more chance to talk. I gave you a chance to bring the money . . . you didn't bid. There is no proof necessary."

"MISS ARLYNNE SHERMAN: There is $6,000 there, and a guarantee on $34,000."

### DUE PROCESS

The contention that there was no hearing, no proof offered, no evidence taken is unavailing. There was no pleading filed by any appellant, no traversal of the allegations of the petition. There was no issue to be tried. All the interested parties were present or represented and all acquiesced in the statements made by the court and the lawyers. Prior to the sale not a single objection was made; not a protest; not an assignment. Failure to object to the colloquy or to any factual statement was an effectual waiver of objection to the unsworn proof. (*Estate of Wilson*, 116 Cal.App.2d 523, 526 [253 P.2d 1011]; *Estate of Da Roza*, 82 Cal.App.2d 550, 555 [186 P.2d 725]; *Tennant* v. *Civil Service Com.*, 77 Cal. App.2d 489, 497 [175 P.2d 568].)

The *Estate of Wilson* is specially pertinent. There the

residuary legatee appealed from an order entered under conditions parallel to those at bar. The executor had reported the facts in his petition, showing the advantage of the compromise and relating that a dispute had arisen between the estate and an heir and asserting his "belief that it is for ' the best interests of said estate to enter into the proposed agreement of compromise." Such statement gave the court jurisdiction to consider the petition (p. 525). A discussion followed the reading of the compromise agreement in which the executor and counsel of all parties participated. No objection was made. That no witness testified or was sworn was unnoticed by the appellant and his counsel. Objection to the procedure was therefore waived. If any, it should have been made while the evidence was offered when it could have been remedied. (P. 526.) Likewise, in the *Estate of Da Roza*, the same experiences were recorded and the reviewing court affirmed by virtue of the same doctrine. ■ Permitting a person to testify without being sworn does not affect the court's jurisdiction. (*Tennant* v. *Civil Service Com.*, *supra*, p. 498.)

### THE FINDINGS ARE SUPPORTED

This brings us to the contention that the findings are not supported by the evidence. By virtue of the foregoing discussion and authorities, the statements made by the participants in the colloquies with the court afford substantial support for the findings.* ■ The notion that there can be

---

*I. That the Executor has in his possession as Executor of the above entitled estate 1550 shares of no par value stock in CALIFORNIA STUDIOS, INC. which belonged to the decedent in his lifetime, and to the estate of decedent; that the said stock has been appraised by PAUL GRIMM, Inheritance Tax Appraiser duly appointed by this Court, as having a value of $5,400.00.

II. The Court finds that all of the allegations of the petition of the Executor concerning the impaired financial status of CALIFORNIA STUDIOS, INC., a debtor of this estate, are true.

III. The Court finds that if the sale is not confirmed and the plan of reorganization referred to in said petition is not forthwith concluded, there is grave danger to the probate estate herein that the stock referred to and the claim of the estate against CALIFORNIA STUDIOS, INC. will be seriously, if not totally destroyed.

IV. The Court finds that it is to the best interest of the estate that the petition of the Executor to sell the 1550 shares of stock of CALIFORNIA STUDIOS, INC. to GROSS-KRASNE, INC. and that the indebtedness of CALIFORNIA STUDIOS, INC., to the Estate of HARRY SHERMAN, Deceased, in the approximate amount of $36,000.00 be compromised in the amount of $34,000.00, payable $4000.00 on the 5th day of April, 1953, and $1000.00 per month thereafter, commencing on the 1st day of May, 1953, and continuing on the 1st day of each and every month until the total

no appraisement of any item of the assets of the estate until all have been inventoried is utterly fanciful. Courts are not required to abandon the use of common sense because they deal with serious affairs. It may often occur that an executor must act speedily with reference to an item of property to prevent the loss of it. No statute or rule of court is so sacrosanct as to require an estate to suffer a loss rather than have the item specially appraised and sold if necessary to prevent loss.

---

sum of $34,000.00 has been paid in full, such payments to be evidenced by the note of CALIFORNIA STUDIOS, INC., payable to JACOB H. KARP, as Executor of the Estate of HARRY SHERMAN, Deceased, upon the usual commercial form, but without interest, and that payment thereof be guaranteed by GROSS-KRASNE, INC., a California corporation. The Court further finds that it is to the best interest of the estate that the 1550 shares of stock be escrowed with H. P. BABSON, of Los Angeles, California, as further security for the payment of the $34,000.00 claim of the estate against CALIFORNIA STUDIOS, INC.

V. That after Findings I, II, III and IV were made objectors requested time within which to meet said offer and the Court set the formal approval of Executor's petition until three P.M., December 5, 1952, to afford objectors an opportunity to be present in Court with a bona fide offer which would be for an amount equal to the offer of GROSS-KRASNE, INC. for the stock, plus 10% and for the purchase of the claim of estate against CALIFORNIA STUDIOS INC by a note in the same terms as above, secured by a pledge of Bonds, in the amount of $34,000.00, plus 10% or securities listed on the New York Stock Exchange with a market value of 115% of $34,000.00 to be pledged with the estate as security for payment to the estate of said note for the purchase of the claim against CALIFORNIA STUDIOS, INC. The objectors offered no objections to the conditions imposed by the Court.

The Court having adjourned further consideration of the matter until 3 P.M. the consideration of the matter was again resumed at 3 P.M. The Court inquired of the objectors whether they were prepared to meet the conditions set down by the Court at the time of noon adjournment. At that time and place the objectors did not, nor did any one of them, present any bidder to meet the conditions laid down by the Court, the Court thereupon, after offering the stock and the compromise of claim in open Court, one, two and three times, ordered that the petition of the Executor, JACOB H. KARP, be approved.

VI. No written objections to the petition of said Executor were offered at any time up to the hour of 3:08 P.M., December 5, 1952, and the Court approved the petition of the Executor.

#### CONCLUSIONS OF LAW

It being to the best interest of the Estate of HARRY SHERMAN, Deceased, and the court in the exercise of its sound discretion imposed upon it under the law, it is hereby ordered and the Court concludes that the Executor should sell 1550 shares of the capital no par value stock of CALIFORNIA STUDIOS, INC. to GROSS-KRASNE, INC., for the sum of $5316.50, and that the claim of said estate against CALIFORNIA STUDIOS, INC be compromised in the amount of $34,000.00, payment therefor to be represented by the note of CALIFORNIA STUDIOS, INC. and guaranteed by GROSS-KRASNE, INC., a California corporation.

Dated at Los Angeles, California, this 5 day of December, 1952.

As to the impaired financial condition of the Studios, Inc., that was a fact openly discussed and never questioned. It was implied in the statements of practically every party to the colloquy with the court; especially in the statement that the corporation had no funds; required the assistance of the bankruptcy court; owed $132,000.

The finding that there is grave danger to the estate if the sale to Gross-Krasne is not approved and the compromise of the estate's claim against the Studios Inc. is not effected, is the only deduction fairly to be drawn from the discussions with the court, the poverty of the corporation, and the order of the referee in bankruptcy.

As to the finding that it was to the best interests of the estate to sell the stock and to compromise its claim of $36,000 for $34,000, it is supported by the facts reported in the petition and stated by counsel to the court. There was no objection to the sale of the stock or to the settlement of the claim for $34,000 payable on the terms suggested. In truth, Arlynne Sherman, in the closing "moments of the court's session on December 5" stated that she had the money to bid for the stock and the securities with which to effect the purchase of the estate's claim against Studios, Inc. There was no question raised as to the wisdom or propriety of the sale or of the compromise which was in truth established by the executor's petition. The fact that the findings may have been prepared prior to the conclusion of the hearing presents neither a novelty nor proof of corrupt dealing. The interest of the executor and his prospective purchaser in the success of the executor's petition was sufficient, under the circumstances, to spur them to diligent action in an effort to consummate the sale and compromise before the referee in bankruptcy might take over the assets of California Studios Inc.

Appellants crown their argument on the findings by the statement "that after findings I, II, II and IV were made they requested time within which to meet the offer and the court set the hour for a formal approval of executor's petition at 3 p. m. to afford objectors an opportunity to be present in court with a bona fide offer," etc. Now as to their securing $34,000 by either 110 per cent in United States bonds or 115 per cent in listed securities, no objection was at the time interposed by anyone to such conditions. There was no intimation of opposition to the sale or the compromise until the afternoon session which was to be held solely to enable

the objectors to offer a higher sum than that made by Gross-Krasne. Nor was there objection to the conditions the court had attached to the offers to be made by others. After the court had waited nine minutes for advanced offers it reminded those present that the postponement had been taken for the "sole purpose of seeing whether a bid would be forthcoming on this stock which is being sold for $5,361.50 and would require that the estate be secured in the matter of the $34,000." Thereupon, Arlynne's counsel objected "to accepting bids upon the terms which have been offered . . . on the grounds that . . . Arlynne . . . a beneficiary, is being treated inequitably by being required to meet the terms of 110 per cent United States bond collateral." She made no offer to meet the requirements of the court. She had enjoyed the ten-day period after November 20 to prepare for the fatal hour. It was then she had heard the discussion in the bankruptcy court. She had known of the executor's petition and the Gross-Krasne offer since November 14 and the counter-offer that another would have to make to supplant that reported in the petition. Moreover, the condition that a counter-offer must include a guaranty that the $34,000 would be, in fact, paid was not unreasonable. Any businessman under the same circumstances would have required some insurance that so much money would certainly be paid. A court should do no less on behalf of a decedent's estate than the latter would have done in his lifetime.

Finding VI is supported by the evidence which has been recited in the foregoing. No written objections were ever filed or even offered until the preliminaries and the argument had passed and the court's decision had been announced; yea, not until the court had finally called for counteroffers for the stock. If she and her attorney were in good faith, the written objections held then by Arlynne's lawyer might have been filed before the first day of the hearing. But, filed at any time, the court was not obliged to sustain them. ▆▆▆ She was treated as any other bidder. Her being an heir did not require the court to adopt a special rule for her bid. Likewise, the asserted offer of proof was entitled to no consideration after the court, counsel and the parties had threshed out the subject. The afternoon of December 5 was selected as the occasion for the final bid. The court then properly declined to enter into a skirmish over the form or contents of a new offer.

No finding is without support.

The complaints that (1) no notice was given with an order fixing the terms and conditions of sale (Prob. Code, § 771); (2) personalty may be sold only after 10 days' public notice in three public places and sales must be made at the courthouse door (*idem.* § 772); (3) the probate court lacked jurisdiction to direct affairs and improve conditions to benefit corporations; (4) the executor may act after 60 days under circumstances set forth in section 718.5 of the Probate Code; (5) the probate judge had no jurisdiction to direct the corporate acts of California Studios, Inc.; (6) no appraisal was filed; (7) a California corporation cannot sell all its assets without the consent of its stockholders; (8) there was no compliance with section 755 of the Probate Code; (9) there was no statutory authority to combine a sale of assets of an estate with a compromise of the estate's claim—the replies to such contentions are all answered in the foregoing discussion. The executor faced a crisis immediately upon qualifying. He met it in a bold, straightforward manner, expeditiously and conscientiously. Had he not done so, the judge who is now criticized for his orders might already have installed a new administrator.

Order affirmed.

McComb, J., and Fox, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 16, 1955. Carter, J., was of the opinion that the petition should be granted.